IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMANDA J. THEISEN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3253 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | MEMORANDUM AND ORDER |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Amanda Theisen ("Theisen"), seeks review of a decision by the defendant, Michael Astrue, the Commissioner of the Social Security Administration ("Commissioner"), denying her applications for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq., and for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the court finds the Commissioner's decision should be affirmed.

I.  PROCEDURAL BACKGROUND

Theisen applied for social security disability benefits on March 17, 2008, claiming major depression and schizophrenia[1] have rendered her disabled and unable to work since March 15, 2008.[2] Social Security Transcript ("TR") at 52. Her application for disability was initially denied June 5, 2008, (TR 14), and upon reconsideration on August 19, 2008. (TR 14).

---

[1] As noted by the ALJ it is not entirely clear from the medical records if doctors have determined whether Theisen has a diagnosis of schizoaffective disorder or paranoid schizophrenia with depression. (TR. 21). However, the ALJ accepted a finding that Theisen's diagnosis is schizoaffective disorder, depressive type. (TR. 18); see also (TR. 298) (John J. Curran, Ph.D. providing a diagnosis of schizoaffective disorder, depressive type).

[2] Theisen originally claimed an onset date of January 15, 2008, but amended the date to March 15, 2008 at the hearing.

Theisen filed a hearing request, and the hearing was held before an Administrative Law Judge ("ALJ") on November 18, 2009. (TR 42). Theisen was represented by counsel at the hearing. Testimony was received from Theisen and Robin A. Cook, Ph.D., a vocational expert ("VE") who appeared at the request of the ALJ. The ALJ's adverse decision was issued February 19, 2010. TR. (11-29), and Theisen's request for review by the Appeals Council was denied on October 27, 2010. (TR 1-4). Theisen's pending complaint for judicial review was timely filed on December 27, 2010. (Filing No. 1).

## II. THE ALJ'S DECISION

The ALJ evaluated Theisen's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920. (T.R. 14-28). As reflected in her decision, the ALJ made the following findings:

1) The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2) The claimant has not engaged in substantial gainful activity since March 15, 2008, the amended alleged onset date.

3) The claimant has the following severe impairments: schizoaffective disorder, depressive type; morbid obesity, weight of 330 pounds on a five feet ten and one half inch frame for a body mass index (BMI) of 46.7; and degenerative disc disease (DDD) of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

5) The claimant has the residual functional capacity to perform light work[3] as defined in 20 CFR 404.1567(b) and 416.967(b), provided she can only occasionally climb ramps and stairs; cannot climb ladders, ropes and scaffolds; occasionally to balance, stoop, crouch, kneel and crawl; must avoid concentrated exposure to hazardous conditions, such as unprotected heights and hazardous machinery; can perform tasks that can be learned in thirty days or less involving no more than simple work-related decisions with few work place changes (unskilled work); and must be limited to only occasional interaction with the public, co-workers and supervisor.

6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7) The claimant was born on July 28, 1981 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR 404.1567(b) and 416.967(b).

9) Transferability of job skills is not material to the determination of disability; under the framework of the Medical-Vocational Rules, the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10) Considering the claimant's age, education, work experience, and residual functional capacity, there are significant numbers of jobs exist in the national economy which the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

### III. ISSUES RAISED FOR JUDICIAL REVIEW

Theisen's complaint requests judicial review of the ALJ's decision. She raises the following arguments in support of her claim for reversal:[4]

1) The ALJ's decision is erroneous because the ALJ did not give proper weight to the opinions of treating medical sources; and

2) The ALJ failed to make proper credibility findings as to Theisen's testimony of subjective complaints, including, but not limited to, her complaints of pain and depression.

The Commissioner denies both claims.

---

[4] Theisen is only challenging the ALJ's findings with respect to Theisen's mental impairments and does not contest the ALJ's ruling on Theisen's physical impairments. (Filing No. 17, p. 5).

IV. THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of her hearing, Theisen was twenty-eight years old. She completed her college education in 2003. Thereafter and until the onset of her alleged disability, she worked as a corrections officer and as a dietary aide. She is able to read, write, and speak English. She has not worked since March 15, 2008.

The plaintiff has both physical and mental impairments. At the age of 16 she began participating in mental health counseling, was diagnosed with depression and was prescribed an antidepressant medication at that time. (TR 246). She continued to receive treatment for depression; at the age of 20 she sought treatment from Gary West, P.A. at the Wayne State College health clinic and was diagnosed with schizophrenia. (TR 246).

From 2002 to 2007, the plaintiff continued to receive care from Mr. West at the Mercy Medical Clinic in Wayne, Nebraska for "paranoid schizophrenia manifested by delusions and depression." (TR 271). During the first few months of 2007 she complained of depression and hearing voices. (TR. 276-77). In order to address the issues, Mr. West prescribed different types of medications. In March of 2007, Mr. West changed the prescription in an attempt to control plaintiff's hallucinations. (TR 277). By May of 2007, the plaintiff reported that her "delusions are gone and the paranoia and the voices are gone as well." (TR 277). However, she was feeling "more depressed" and had trouble sleeping. (TR. 277). Mr. West attempted to adjust her medication further, presumably to address her depression. (TR. 277).

Theisen began receiving treatment from Kylene Schroer, APRN at Good Neighbor Mental Health Clinic in Columbus, Nebraska in December of 2007. (TR 258). Theisen indicated that she had schizophrenia, depression, was suffering from auditory hallucinations, and had suicidal thoughts. (TR 258). Her initial Global Assessment of Functioning ("GAF")

5

was 60-65.[5] Nurse Schroer adjusted plaintiff's medications to address Theisen's reported symptoms.

In January of 2008, Theisen reported concern that she might run out of medication because she was denied financial assistance for her medication. (TR 254). At that time Theisen denied having hallucinations or delusions, but feared a "psychotic break" if she was forced to change medication, "as this has happened in the past." (TR 259). She did run out of medicine for a few days in February of 2008 and experienced suicidal thoughts, but once Theisen was able to begin taking the medication again, she reported that her suicidal thoughts subsided and felt her "mood [was] improving." (TR 254). On February 20, 2008 her prognosis was deemed "good [with] availability of medication." (TR. 253). But by March 18, 2008, Theisen was once again reporting that her "auditory hallucinations [were] constantly present [and] more intrusive, they distract her at work [and] tell her to kill herself when alone." (TR 255). On March 19, 2008, she reported "great difficulty performing job tasks" at work that day. (TR 256). Her GAF at that time was reported at 40-45.[6] (TR 256).

On March 25, 2008 Theisen visited Schroer for "medication management." (TR. 257). Schroer's treatment notes include comments that Theisen is "[u]nable to perform employment tasks at this point due to internal distractions." (TR 257). Theisen also reported continuing auditory hallucinations. (TR 257). Her GAF was assessed at 40-45. (TR 257).

---

[5] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. GAF scores in the 61 to 70 range indicate "mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. 2000) (DSM-IV).

[6] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

In May of 2008, John Curran, Ph.D. performed a consultative psychological examination of Theisen. (TR. 279-287). Dr. Curran summarized his findings as follows:

> There does appear to be a restriction of activities of daily living. She does very few activities each day, she has no energy, she socializes little, she needs reminders to do hygiene activities, and she is believing that others are constantly watching her. There are difficulties in maintaining social functioning. She has little enthusiasm and initiative, so she socializes less than before. There do not appear to be recurrent episodes of deterioration when stressed. She does appear to have the ability to understand and remember short and simple instructions. She does not appear to have the ability to sustain concentration and attention needed for task completion. By her report and her boyfriend's report, he must frequently remind her about her daily activities, such as hygiene activities and appointments. She does not appear to have the ability to carry out short and simple instructions under ordinary supervision. She complained of fatigue and difficulty focusing. She would likely need reminders and rest breaks. She does not have the ability to relate appropriately to coworkers and supervisors. She showed little enthusiasm for interacting with others and would likely interact minimally with them. She also struggles with paranoia, frequently worrying that others are watching her. She does have the ability to adapt to changes in her environment.

(TR. 286).

He assessed her GAF at 42. In addition, Dr. Curran opined that Theisen seemed to function well on medication until she was diagnosed with an ulcer in early 2008. (TR. 287). He further suggested that it would take "four to six months to improve [Theisen's] mental condition at best." (TR. 287). Dr. Curran opined that she should continue to work with Nurse Schroer to "redo her medication," but also indicated Theisen might benefit from working with a psychiatrist "who would have more experience working with more troubled individuals." (TR. 287). He also noted that Theisen has never received psychiatric in-patient care at a hospital. (TR. 295).

Theisen continued to see Nurse Schroer throughout 2008 with little improvement until July 8, 2008 when she reported that her hallucinations had lessened and she began attending

7

the Liberty Centre[7] in Norfolk, Nebraska. Nurse Schroer reported Theisen's GAF as 60-65 on that date. (TR. 331). From July of 2008 until December of 2008, Schroer's notes reflect a general stabilization and eventual improvement in Theisen's condition as evidenced by GAF scores consistently in the 60's and reaching 70 on December 18, 2008 and again on January 29, 2009 . (TR. 514-24). A sampling of Schroer's notes and reported GAF scores are provided below:

- August 14, 2008 – she "denies wanting to die or having a suicide plan. Increased stress due to [the increase in the] quantity of time [with her significant other's] son." GAF of 50. (TR. 523).

- August 19, 2008 – "Feels like she is able to deal [with] paranoia [and] visual hallucinations . . . . [Significant other's] son is not [with] them this week . . . she is more relaxed this week." GAF 55. (TR. 522).

- September 17, 2008 – "Has learned to self-talk through visual hallucinations [and] finds this to be effective." GAF 65. (TR. 520).

- October 10, 2008 – "Wellbutrin has helped to lessen her mood of depression." She also reported no hallucinations. GAF 65. (TR 518).

- October 31, 2008 – She reported being "tired all the time," but [f]eels Wellbutrin has helped to boost her mood." GAF 65 (TR 517).

- November 25, 2008 – "Often forgets noon med[ication] . . . is more animated than in prior appointments. GAF 65 (TR. 516).

---

[7] Theisen described the Liberty Centre as "a day rehab.for people with mental illness." (TR. 53).

- December 18, 2008 – "Experienced visual hallucination [one time] [and] anxiety. GAF 70. (TR. 515).

- January 29, 2008 – "Seeing Dr. Banik in Norfolk. . . . [H]e will be taking her off several of her meds [and] she will get an ample supply from her current provider to allow for gradual titration off the meds." (TR. 514).

In December of 2008, Nurse Schroer also completed a "Mental Health Statement" and a "Mental Impairment Evaluation" on behalf of Theisen. (TR. 362-71). In response to the questions on these forms, Nurse Schroer provided the following information:

- "[T]he stressors of performing job duties were triggering auditory hallucinations which in turn caused internal distraction that hindered her performance." (TR. 365).

- Theisen "[n]eeds reminders from family [and] partner to perform household duties [and] attend Liberty House." (TR. 364).

- In February of 2008, Theisen "was suicidal . . . . Auditory hallucinations were command in nature and made employment next to impossible." (TR. 366). However, the auditory hallucinations were "controlled" at the time Schroer completed the questionnaire on December 10, 2008. (TR. 367).

- Nurse Schroer opined that Theisen was incapable of completing any work in December of 2008. (TR. 370).

9

- "Exacerbations of schizophrenic psychosis are unpredictable [and] [Theisen] has frequent exacerbation with unidentifiable triggers. However, demands of job have triggered auditory hallucinations in the past." (TR. 371).

- Nurse Schroer further opined that Theisen was "markedly limited" in her ability to maintain attention and concentration for extended periods; in her ability to perform activities within a schedule, to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; or to complete a normal workday and workweek without interruptions from psychologically based symptoms. (TR. 368-69).

Sanjoy Banik, M.D., a physician at Faith Regional Psychiatric Services in Norfolk, Nebraska began treating Theisen on January 27, 2009. (TR. 244-45). He noted that Theisen "did not appear psychotic or dangerous to self or others in any manner" and "appears at an average level of intellectual functioning." (TR. 244). He assessed her GAF at 50+. (TR. 244). The next month, Theisen indicated that she was feeling depressed, but reported "good effect" from her medication. (TR. 243). She also stated that she was not experiencing any "auditory or visual hallucinations" at that time. (TR. 243). By March of 2009, Dr. Banik reported that Theisen was complaining of "occasional auditory hallucinations" and he measured her GAF at 40. (TR. 241). Theisen discontinued her treatment with Dr. Banik shortly thereafter and returned to treatment with Nurse Schroer in March of 2009. (TR. 513).

Nurse Schroer reported Theisen's GAF scores steadily increased from 51-60 in March of 2009 to 71-80 in July of 2009 (TR. 502-13). On July 21, 2009, Schroer noted that Theisen was "more animated than in any prior appointment" and "is able to speak to different activities she engages in with her partner's son such as fishing and taking him to the park." (TR. 503). However, by September of 2009, Theisen reported she was experiencing increased delusional thoughts and auditory hallucinations. (TR. 501). Her GAF score was 41-50 at that time and was reported as 31-40 in October of 2009.

In addition to treatment from Nurse Schroer and Dr. Banik, Theisen received counseling from Crystal Matthews, M.S.E., a provisionally licensed mental health care provider, supervised by Robin R. Huebner, Ph.D. at Behavioral Health Specialists, Inc. in Norfolk, Nebraska. (TR. 324).  Theisen engaged in counseling sessions with Matthews during which Theisen identified problems and developed action steps to deal with her identified issues, including dealing with stress, which Matthews identified as a trigger to her depressive symptoms. (TR. 528). With the counseling, the GAF scores reported by Matthews steadily increased from 40 in June of 2008 to 60 in June of 2009. (TR. 528-37).

In her initial assessment, Matthews noted Theisen's "prognosis seems hindered without implementation of structure in her life" and recommended Theisen attend the Liberty Centre (TR. 327). The record reveals Theisen has sporadically attended the Liberty Centre, and as part of the program has helped with clerical work in the "business unit" and coordinated rides for other individuals attending the Centre. (TR. 54). However, Theisen indicated that the attendance was not regular on days when she cares for her boyfriend's son. (TR. 511).

A mental RFC performed on June 6, 2008 by Linda Schmechel, PhD, states Theisen has "[p]sychotic features and deterioration that are persistent (continuous or intermittent) as evidenced by . . . [d]elusions or hallucinations." (TR. 310).  In addition Dr. Schmechel determined Theisen had a "[d]isturbance of mood, accompanied by full or partial manic or depressive syndrome," with "[d]ecreased energy," "[f]eelings of guilt or worthlessness," "[d]ifficulty concentrating or thinking," "[t]houghts of suicide," or "[h]allucinations, delusions or paranoid thinking." (TR 311). The RFC further explains Theisen has a moderate limitation in maintaining social functioning and in maintaining concentration, persistence, or pace. (TR. 318).

11

In summary, Dr. Schmechel opined:

> [Theisen has] "a severe mental condition (schizoaffective disorder or paranoid schiz. with depression) but duration is an issue. She was pretty well stabilized until 2/08 or thereabouts, then regressed in terms of overall functioning. It would appear that if re-stabilized she would be able to return to at least simple work - she has in the past conquered similar setbacks. Thus suggestion is to consider a duration denial on mental for this case. . . . At present she lacks ability to concentrate and attend sufficiently to work independently but by 2/09 should have regained that with medical stabilization. Allegations are partially credible (supported by MER).

(TR. 320).

At the hearing before the ALJ on November 18, 2009, Theisen testified that she has difficulty adding and subtracting two-digit numbers; she hears voices that are loud and derogatory and are more prevalent when she is under stress; has difficulty keeping track of time; naps daily when she is at home; is able to do household work including washing dishes, cooking and caring for her boyfriend's five year old son; has trouble staying focused; participates in activities at the Liberty Centre; attends an exercise class three days a week for approximately an hour; and assists her boyfriend's son with a paper route.

After reviewing the evidence of record and listening to the testimony of the plaintiff, the ALJ asked the VE to assume a hypothetical individual who:

- is the same age, has the same educational level, and past work experience as the plaintiff;
- is limited to light work;
- can occasionally climb ramps and stairs;
- can occasionally balance, stoop and crouch, and kneel and crawl;
- has nonexertional mental limitations

12

- should avoid work in the presence of concentrated exposure to hazardous conditions, including unprotected heights and hazardous machinery;
- is limited to tasks that can be learned in 30 days or less, involving no more than simple, work-related decisions with few workplace changes and no more than occasional interaction with the public, coworkers and supervisors.

Assuming these restrictions, the VE testified the plaintiff could not perform any of her past work. However, the VE provided 3 examples of work the hypothetical individual could perform:

- Garment sorter, DOT number 222.687-014, with approximately 1,480 jobs available in Nebraska and 208,160 available nationally;

- Document preparer/microfilm, DOT number 249.587-018, with approximately 155 jobs available in Nebraska and 31,040 available nationally; and

- Grinding machine operator, DOT number 690.685-194, with approximately 730 jobs available in Nebraska and 41,670 available nationally.

(TR. 79-81). The VE further testified that no jobs existed for a hypothetical individual who, in addition to all of the restrictions assumed in the first hypothetical, was unable to perform at a consistent pace for about half the day and would have two unexcused absences a month secondary to symptoms or treatment.

Under questioning from the plaintiff's attorney, the VE also stated no jobs were available to an individual who has a "seriously limited" ability to relate with coworkers, deal with the public, use judgement, interact with supervisors, deal with work stresses, function

13

independently, maintain attention and concentration, and remember and understand detailed instructions.[8]

## V. ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001) .

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010).

---

[8] The criteria for this hypothetical were taken directly from the Mental Health Statement of Ability to do Work-Related Activities (Mental) completed by Dr. Schroer for the plaintiff in December of 2008. (TR. 362-371).

14

A.   Failure to Afford Proper Weight to Kylene Schroer's opinion

Theisen contends the ALJ, in determining her RFC, erred by not giving proper weight to the opinion of Nurse Schroer, Theisen's primary care provider throughout the duration of Theisen's claimed disability.

> The opinion of a treating physician must be afforded substantial weight, but only where the opinion comes from an "acceptable medical source." 20 C.F.R. § 404.1527; see also, Burress v. Apfel, 141 F.3d 875, 880 (8th Cir.1998). Acceptable medical sources are listed in 20 C.F.R. § 404.1513(a) and include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.

Flaherty v. Halter, 182 F. Supp. 2d 824, 828 (D. Minn. 2001).

Thus, if an opinion is not from an "acceptable medical source," the opinion is not entitled to controlling weight, and is considered in accordance with the record as a whole. See, e.g., Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007) (evaluating the opinion of a medical provider in the context of the entire record). Where medical evaluations or assessments are inconsistent with other evidence or where one provider issues inconsistent opinions, the ALJ may discount the evaluation or assessment. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

In this case, the ALJ specifically stated she was giving little weight to the evaluation completed by Nurse Schroer on December 10, 2008. (TR 26). Nurse Schroer opined Theisen was "markedly limited" in a number of areas impacting her concentration and persistence and found her ability to adjust to a job to be poor in a number of respects as well. (TR. 363-70). Ultimately she opined Theisen was unable to perform any work. (TR. 370).

However, the ALJ determined "Nurse Schroer's treatment notes do not support the severity level in her opinion." (TR. 26). For instance, in December of 2008, Schroer indicated

Theisen's progress was "positive" and her prognosis "fair" and Nurse Schroer assigned Theisen a GAF score of 70. (TR. 515). A GAF of 70 is indicative of "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . ." (DSM IV p. 34). For the period from July 29, 2008 to July 9, 2009, Schroer's evaluations produced one GAF score of 50, four GAF scores between 50 and 60, and eleven GAF scores over 60, including several at 70 or higher. (TR. 502-524). Such scores are inconsistent with Schroer's assertion Theisen was unable to complete any work as of December 10, 2008 and undermines her opinion that Theisen was totally disabled during the time period in question. See, e.g., Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)(noting testimony that the claimaint suffered from "severe" limitations was inconsistent with the claimant's GAF score of 58).

Moreover, Theisen was examined by Dr. Huebner in August, 2009, the licensed psychologist who supervises Crystal Matthews, Theisen's counselor. Dr. Huebner stated Theisen was coping better with her "hallucinatory [and] depressive symptoms" and was able to "manage" her household and provide care for her significant other's son. (TR. 527). This finding provides support the ALJ's contention that Nurse Schroer's 2008 opinion was outdated and deserved little weight.

Theisen also argues that the ALJ "indicated she believed the plaintiff met a listing from March 15, 2008 until June 30, 2009." Filing No. 17, p. 12. However, a careful examination of the record reveals the ALJ did not definitively find Theisen met a listing or that the ALJ would be inclined to "pay the case." The record reflects the following:

> ALJ: Counsel, this is my concern with the case. I looked at it last night and I thought this person probably meets a listing, but within a year her GAF scores lifted. And it sounds like she is probably capable of sustaining unskilled work. And that's in the period, but she demonstrated in a time that began in June of '08 which is just beyond a year. I would entertain a closed period. What I would do is entertain a closed period of March 15 of '08 until the date

16

                                where I get you approved was -- had a GAF of 60 in June of '09, so through June 30 of '09.

ATTY:        Well, I understand that, Your Honor, and then again in July of '09 she had another pretty high GAF score, but then that next time she went to see the nurse practitioner it was down to 40 to 50 again. And so I just have --

ALJ:         All right. Well, I'm just suggesting --

ATTY:        Yeah.

ALJ:         -- that it's possible here.

ATTY:        Yeah.

ALJ:         I do think I'm stretching it given that we've got GAF scores kind of up and down depending on the day and what's going on in her life more so than the underlying mental illness. I'll take a look at these more recent notes again. All right.

(TR. 71-72).

Contrary to Theisen's assertions, the ALJ did nothing more than make a generalized statement that upon her initial review of the evidence, she thought Theisen "probably" met a listing for a limited time frame. However, the ALJ also noted the she thought that even if she elected to pay the case for a closed period she would be "stretching it," noting the vast range of Theisen's GAF scores during the year and the fact that her GAF scores appeared to be influenced not by her mental illness, but by her life events. (TR. 72). The ALJ then stated she wanted to review the evidence again, which she did after the hearing and prior to the issuance of her opinion. (TR. 72). Obviously, the ALJ reached the conclusion that Theisen did not meet a listing and did not meet the duration requirement for even a closed period. As explained above, there is evidence in the record to support the ALJ's decision to give little weight to Nurse Schroer's evaluation from December of 2008.

B.   Assessment of Theisen's credibility.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). Before the ALJ determines an applicant's RFC, the ALJ must determine the applicant's credibility, because subjective complaints play a role in assessing the RFC. Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."). An ALJ "is not required to discuss every piece of evidence submitted," and his "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

The ALJ must apply the factors found in Polanski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) in assessing the credibility of a claimant's subjective complaints, including: (1) the claimant's daily activities; (2) the duration frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polanski, 739 F.2d at 1322. An ALJ is not required to discuss each of these factors. It is sufficient that the ALJ acknowledges and considers the factors prior to discounting the claimant's subjective complaints. Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009)).

The ALJ discounted Theisen's testimony regarding the intensity, persistence, and limiting effects of her symptoms. (TR. 21). Specifically, the ALJ discredited Theisen's testimony that her "mental functioning is about the same as when she stopped working." (TR. 22). Theisen asserts the ALJ relied solely on Theisen's work record prior to the alleged

18

decomposition date of March 15, 2008, and thus, erred in her decision to discredit Theisen's testimony. Upon review of the ALJ's decision, the court is unpersuaded by Theisen's argument. It is true the ALJ cites to Theisen's work record as evidence her condition can be controlled by medication, however, the ALJ cited to additional evidence to support her finding that Theisen's testimony was not credible.[9] The ALJ also considered Theisen's daily activities, her improvement with medication and counseling, her inconsistent compliance with mental health treatment, and the inconsistency between her allegations and the objective medical evidence. (TR. 21-25). Importantly, the ALJ noted that Theisen experienced "rapid improvement from impairment in reality testing to only mild symptoms" after receiving seven weeks of consistent therapy from May of 2008 to July of 2008. (TR. 22).

Moreover, Theisen, by her admission and the admission of her boyfriend and her mother, has been able to engage in activities of daily living which support the ALJ's conclusion that Theisen is able to conduct light work. For instance, she is able to care for her boyfriend's 5 year old son; participate in exercise classes; complete structured activities in the business unit at the Liberty Centre; and she is able to socialize with family and friends, and participate in hobbies, such as bowling.

In addition, the ALJ cited to notes from Theisen's health care providers indicating Theisen's condition stabilized after her alleged onset date. Dr. Banik reported in January of 2009 that Theisen sought his assistance with medication management, reported no complaints at that time, and was only experiencing visual and auditory hallucinations on Friday nights when she was alone. (TR. 246). On January 27, 2009, Dr. Banik also noted that Theissen exhibited "no disorganization of thought processes . . . [and] [did] not appear psychotic or dangerous to self or others in any manner . . . . Memory and concentration [did] not appear

---

[9] The ALJ cited to Theisen's prior work history as evidence Theisen's condition has previously stabilized with consistent treatment, a finding which is supported by the treatment notes and GAF scores of record, even after the alleged onset date.

19

impaired." (TR. 244). He assigned a GAF score of 50+. (TR. 244). As the ALJ points out, Dr. Banik's evaluation is consistent with the opinion of the State agency psychological consultant who believed, with treatment, Theissen's condition would improve by February of 2009. (TR. 320). In fact, the record indicates she began to stabilize as early as October of 2008, (see e.g., TR. 518 (Nurse Schroer noting medication "helped lessen [Theissen's] mood of depression" and assigning a GAF score of 65), and maintained this improved condition until September of 2009.

Finally, the ALJ also noted Theisen's compliance with her treatment regimen has been inconsistent. For instance, Theisen did not admit herself to the hospital emergency room for treatment, despite her physician's instructions to do so, and she admits to occasionally missing her medication and placing her boyfriend's childcare needs ahead of her rehabilitative participation at the Liberty Centre. (T.R. 246, 511, 513 & 516).

There is evidence of record to support the ALJ's conclusion that Theisen's testimony was not credible.

There being substantial evidence of record to support the ALJ's decision,

IT IS ORDERED:

1) The findings and conclusions of the ALJ are affirmed.

2) Judgment in accordance with this memorandum and order will be entered by separate document.

    September 6, 2011                                        BY THE COURT:
                                                                             *s/ Cheryl R. Zwart*
                                                                             United States Magistrate Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.